# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**CAROL McKENZIE**,                    *
                                       *
               Plaintiff               *
                                       *
     vs.                               *     Case No. RWT 03-cv-2993
                                       *
**COMCAST CABLE**                      *
**COMMUNICATIONS, INC.**,              *
                                       *
               Defendant               *

## MEMORANDUM OPINION

In February 2000, Defendant Comcast Cable Communications, Inc. ("Comcast") hired

Plaintiff's husband, Douglas McKenzie ("Mr. McKenzie"), to manage Comcast's Prince George's

County operations.  At the time that Comcast was courting Mr. McKenzie, he resided with his wife

in Louisville, Kentucky and had recently accepted a job with AT&T in Ft. Lauderdale, Florida.

During the negotiations between Comcast and Mr. McKenzie, Jaye Gamble ("Gamble"), the

Regional Vice President of Comcast Cable, learned that the Plaintiff produced and hosted a talk

show in Louisville.  Gamble then volunteered that Comcast would "give her a show up here."  That

"promise" allegedly played a role in Mr. McKenzie's decision to resign the job that he had recently

accepted in Ft. Lauderdale and instead accept the job with Comcast in Maryland.  Comcast never

hired Mrs. McKenzie to produce a television show.

In this suit, Mrs. McKenzie argues that Comcast's failure to hire her to produce a show

constitutes a breach of contract, fraud, and/or a violation of Title VII and §1981.  Mrs. McKenzie

also brings a claim for intentional infliction of emotional distress (IIED).  Her Complaint lists seven

causes of action.  Counts One, Three, and Seven state claims for racial discrimination: both

retaliation under 42 U.S.C. 2000e-3 and the Maryland Fair Employment Act, as well as racial

discrimination under Title VII, §1981, and the Maryland Fair Employment Act.  Counts Two and Four state claims for breach of contract under a verbal contract theory and under a theory of promissory estoppel.  Count Five states a claim under a theory of fraud, and Count Six states a claim under the tort of IIED.

## BACKGROUND

Mrs. McKenzie alleges that Comcast offered to give her a television show as a means of convincing her husband to accept Comcast's job offer.  Mr. McKenzie, in his deposition, explained that immediately after he told Gamble that his wife was an award-winning TV show host and producer, Gamble volunteered that Comcast would "give her her own show."  P's Ex. 4 (Mr. McKenzie Dep. at 20).  As a result of the unsolicited comment from Gamble, Mr. McKenzie listed a TV show for his wife as one of his demands from Comcast.  Id.  Gamble discussed Mrs. McKenzie's show with Mr. McKenzie three times over the negotiations period.  D's Ex. 3 (Mr. McKenzie Dep. at 21-24).

Following the discussions between Gamble and Mr. McKenzie, Comcast faxed an employment letter to Mr. McKenzie outlining Comcast's offer.  See P's Ex. 9.  The letter listed various aspects of Mr. McKenzie's compensation package, but did not include any information regarding Plaintiff's TV show.  The letter did state, however, that "[t]here may be some minor items not covered here, but essentially this is the core and substance of our offer."  Id.  Mr. McKenzie, in his deposition, explained that when he did not see his wife's show on the list he inquired about it to Gamble, who replied "don't worry about it.  It will be addressed when she relocates to Maryland and gets settled."  P's Ex. 10 (Mr. McKenzie Dep. at 29).  Mr. McKenzie also explained that when Gamble made this statement, he also made a reference to the part of the letter stating that there are

some minor items not covered, suggesting that Mrs. McKenzie's show was one of those minor items. Id. Mr. McKenzie, placated by these assurances and pleased with Comcast's offer, accepted the position in Maryland, relocating his family.

Both Mr. and Mrs. McKenzie recall that numerous agents of Comcast made statements regarding Mrs. McKenzie's television show throughout the approximately two years following the commencement of Mr. McKenzie's period of employment. See Compl. ¶12-16. Mrs. McKenzie submits these statements as further evidence of the reasonableness of her belief that Comcast was going to deliver on its agent's prior statements. For example, Mrs. McKenzie testified that Mr. Stephen Burch ("Burch"), President of the Atlantic Division of Comcast, suggested at a Comcast event at the Baltimore Symphony Orchestra that the two of them should "get together" to discuss her show. P's Ex. 12 (Mrs. McKenzie Dep. at 80-82). Mr. McKenzie also testified that, later in 2001, Burch wanted to sit down with Mrs. McKenzie to discuss her show. P's Ex. 17 & 18 (Mr. McKenzie Dep. at 61-62). On other isolated occasions, Mrs. McKenzie contends that Burch and other agents of Comcast made similar statements (e.g. "ready to get your show moving?", "lets sit down to talk about your show"). Comcast counters that 1) no written contract was ever consummated between Mrs. McKenzie and Comcast, 2) the oral communications did not rise to a contract because no agreement was made on significant terms, and 3) Mrs. McKenzie's belief that she was going to be hired to produce a television show was not reasonable because Comcast never responded to written letters inquiring about her show.

Effective January 1, 2002, Comcast terminated Mr. McKenzie. Part of his severance package was an agreement to release Comcast from any contractual or other obligations. See D's Ex. 8 (Excerpt from Separation Agreement and General Release). From this point forward, Mrs.

McKenzie acknowledges that there were no other statements made by agents of Comcast concerning the production of a television show.  In fact, Burch simply ignored Mrs. McKenzie's letters and phone calls over the next few months.  After a short period of time, Mrs. McKenzie realized that Comcast was not going to hire her company to produce and host a television show.

Mrs. McKenzie concedes that no formal writing consummated the deal between herself and Comcast.  However, she nevertheless contends that the verbal assertions made by Burch, Gamble, and other agents of Comcast formed a contract and gave rise to a claims under theories of promissory estoppel, fraud, and IIED.  Additionally, Mrs. McKenzie contends that Comcast's decision not to hire her was racially motivated and/or was in retaliation for her husband's decision to engage in protected activity.

## DISCUSSION

At the close of discovery, Comcast moved for Summary Judgment.  Pursuant to Federal Rule of Civil Procedure 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "A material fact is one that 'might affect the outcome of the suit under the governing law.'"  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  If various inferences can be drawn from certain facts, the court is obligated to resolve those inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Each of Mrs. McKenzie's claims must be judged under this familiar standard.

**Breach of Contract Claim**

Comcast's primary argument that there was no contract between the parties, and thus no cause of action for breach of contract, is based on the omission of any "essential terms" in the alleged agreement between Mrs. McKenzie and Comcast. Specifically, Comcast points out that the parties never agreed on any of the following integral aspects of the agreement: (1) when Mrs. McKenzie's show would start; (2) how long the show would run; (3) who would pay for the staffing and production costs; (4) what rating the show needed in order to continue; (5) what rights Comcast would have to cancel the show; (6) where the show would be produced; (7) what would happen if the show were rerun or put into syndication; (8) what sort of legal relationship would exist between the parties; or 9) how/what she would be paid. D's Mot. at 12-13. Because these terms were not settled, and were, at most, in the negotiations phase, Comcast argues that a contract did not exist under Maryland law. See e.g., Phoenix Mutual Life Ins. Co. v. Shady Grove Plaza Ltd. P'Ship, 734 F. Supp. 1181 (D. Md. 1990).

A long line of Maryland cases hold that "the hallmarks of a binding contract are 'an offer by one party and an unconditional acceptance of that precise offer by the other.'" Estrin v. Natural Answers, Inc., 2004 WL 1444956 at *2 (4th Cir. June 29, 2004) (citing Lemlich v. Bd. of Trs., 385 A.2d 1185, 1189 (Md. 1978)). It is black-letter law that the unconditional acceptance of a precise offer cannot occur if "[s]ignificant terms remain to be negotiated." Estrin, 2004 WL 1444956 at *2. In Estrin, the Fourth Circuit did not find a contract to be in existence because there was no "agreement as to the essential terms of the deal[.]" Id. Other Fourth Circuit and Maryland cases expound the same principle: significant terms must be settled before a court will deem a contract to exist. See ABT Associates, Inc. v. JHPIEGO Corp., 2001 WL 523376, at *2 (4th Cir. May 15, 2001)

("To establish that a binding contract was made, a plaintiff must adduce evidence . . . of a meeting of the minds as to the essential terms of the contract." (citations omitted)); First Nat'l Bank of Md. v. Burton, Parsons & Co., 470 A.2d 822, 828 (Md. Ct. Spec. App. 1984) ("Where an essential element of a contract is reserved for future agreement, no legal obligation as to such element arises until such future agreement is made." (citations omitted)).  However, Maryland law also holds that "[w]here the parties have manifested an intent to make a binding agreement, the mere fact of an open term will not permit them to disclaim it." TecArt Indus. v. Nat'l Graphics, Inc., 181 F. Supp. 2d 451, 457 (D. Md. 2002) (citing Teachers Ins. and Annuity Ass'n of America v. Tribute Comp., 670 F. Supp. 491, 501 (S.D.N.Y. 1987)).  Thus, the court must determine whether the open terms in the agreement between Mrs. McKenzie and Comcast were "essential" thereby precluding formation of a contract or whether the parties intended to be bound notwithstanding these open terms.

The case law does not explicitly define what terms are deemed to be "essential" or "significant."  The open terms in this case included time of commencement, termination, payment, scope, etc.  Although there is no standard definition, if these are not essential or significant terms then the Court cannot fathom what terms would fall under those categories.  Thus, the Court agrees with Comcast that under Maryland case law the absence of terms specifying when the work would start, when it would end, and how Mrs. McKenzie would be paid, renders the alleged contract unenforceable.  Moreover, the relevant case law uniformly refuses to find the existence of a contract when the parties are still in the negotiation phase and have not agreed on integral terms.  In this case, the parties did not agree on any terms, so to say that a contract was formed would be clearly contrary to the law of Maryland.

Mrs. McKenzie argues that the cases cited by Comcast are distinguishable because they only

involve situations where the parties communicated with each other via <u>written</u> correspondence which <u>explicitly</u> stated that their negotiations were not final until a subsequent written document was agreed upon.  The simple fact that the preliminary negotiations in the seminal Maryland cases were written rather than oral does not make them inapposite to the facts of this case.  For example, <u>Phoenix Mutual</u> did rely on the fact that "the letter of intent was expressly non-binding" and that "the parties did not intend to be bound until a formal written agreement was executed."  <u>Phoenix Mutual</u>, 734 F. Supp. at 1187-89.  Those facts, however, were simply <u>evidence</u> that the court considered in order to determine the point at which a contract was formed.   The facts may be different in this case (<u>i.e.</u> verbal communications rather than an exchange of letters of intent), but the rationale from <u>Phoenix Mutual</u> remains relevant and controlling.

Just as in <u>Phoenix Mutual</u>, a court is obligated to consider the facts specific to the case before it in order to determine at what point, if ever, a contract was formed.  <u>See</u> <u>TecArt Indus.</u>, 181 F. Supp. 2d at 456 ("[T]he decision in a case like this one must be based on the particular facts before the Court.  Whether the parties negotiating a contract intended to be bound . . . must be determined from the facts and circumstances in each particular case.").  The evidence in this case consists of verbal communications between an agent (or agents) of Comcast and Mr. and Mrs. McKenzie.  At the conclusion of these discussions, there was no agreement regarding the substantive matters of the TV show.  Although the facts of this case and <u>Phoenix Mutual</u> are not precisely the same, <u>Phoenix Mutual</u> still indicates what aspects of an agreement must be agreed upon in order for a Court to find a contract to exist.  And there was no agreement with regard to those aspects in this case.

Additionally, in contrast to Mrs. McKenzie's assertion, <u>Estrin</u> and <u>ABT Associates</u> did not concern preliminary agreements which <u>expressly</u> precluded the formation of a contract until a final

agreement was reached.  In <u>Estrin</u>, the parties exchanged proposals and counter-proposals until one party decided that the two positions could not be reconciled, thus ending the negotiations.  <u>Estrin</u>, 2004 WL 1444956 at *1.  In this case, Mrs. McKenzie and various agents of Comcast spoke periodically in vague terms about Mrs. McKenzie's TV show.  These informal discussions, and the initial vague offer by Gamble, is the evidence before the Court.  As the Court sees it, these discussions must be classified as "negotiations," just as the written correspondence between the parties were the "negotiations" in <u>Estrin</u>.  The simple fact that <u>Estrin</u>'s negotiations were more formal and concrete, while the negotiations in this case are more appropriately characterized as sporadic interspersed comments, does not dictate that there was a contract in this case.  Mrs. McKenzie admits, as she must, that significant and fundamental aspects of her TV show were yet to be decided.  <u>See</u> D's Mot. at 12-13; D's Reply at 5-6.  Thus, from the evidence before the Court, negotiations were ongoing, and no contract was ever formed.

Just as in <u>Estrin</u>, <u>ABT Associates</u> dealt with parties who drafted several sub-agreements before one side realized that the parties could not agree.  <u>ABT Associates</u>, 2001 WL 523376 *1-*2. Finding that none of the sub-agreements resulted in a "meeting of the minds as to the essential terms of the agreement[,]" the court held that there were "significant open terms" and thus no contract was formed.  <u>Id</u>. at *2.  Mrs. McKenzie argues that <u>ABT Associates</u> is inapposite because "it was clear through the language written by the parties that the parties intended to be bound only upon the finalization of a written agreement."  P's Mot. at 13.  Although the Court agrees with Mrs. McKenzie that the parties in <u>ABT Associates</u> intended to be bound only by a finalized written agreement, her assertion that the parties <u>explicitly</u> agreed to that effect, such that <u>ABT Associates</u> is distinguishable, is not an accurate reading of that case.  Rather, <u>ABT Associates</u> arrived at that conclusion by

8

considering the evidence, i.e. what terms were settled by the parties' preliminary agreements. Undertaking the same inquiry, this Court must determine what terms were settled at the time Mrs. McKenzie argues that a contract was formed.  As the evidence clearly indicates, no significant terms had been agreed upon.  Therefore, under ABT Associates, as well as Estrin and Phoenix Mutual, a contract was not consummated between the parties and the fact that the negotiations were oral rather than written does not distinguish these cases.

Mrs. McKenzie's final attempt to convince the Court that a contract did exist is a reference to a recent decision that relied heavily on a case from the Southern District of New York.  In TecArt, 181 F. Supp. 2d 451, this court determined that the signing by both parties of a "Revised Binding Letter Agreement" was sufficient evidence of an intent to be bound.  Id. at 456-57.  Thus, the evidence before the court in TecArt materially differed from the evidence in Estrin, ABT Associates and this case because the word "Binding" suggests an explicit, or at least a more concrete, desire to be bound.  Mrs. McKenzie places much emphasis on TecArt's statement that "[a]lthough the record here indicates that there were open terms after the [final document] was signed by the parties, their existence does not necessarily mean that no final agreement was reached."  TecArt, 181 F. Supp. 2d at 457 (citing Teachers Ins. and Annuity Ass'n of America, 670 F. Supp. at 501).[1]

Mrs. McKenzie's reliance on this excerpt from TecArt is unavailing.  Initially, it should be pointed out that TecArt is a case where the negotiations were made via written correspondence between the parties.  Mrs. McKenzie has attempted to distinguish Estrin and ABT Associates from

---

[1] TecArt points out that both Phoenix Mut. Life Ins. and ABT Associates cite favorably to Teachers Ins. and Annuity Ass'n of America's "five factors to be considered in determining whether the facts of a case revealed an intent by the parties to be bound by a written document."  TecArt, 181 F. Supp. 2d at 455.  "These factors are as follows: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the custom of such transactions."  Id. (citing Teachers Ins. and Annuity Ass'n of America, 670 F. Supp. at 499-503).

this case because they were based on the court's interpretation of the parties' intent gleaned from scrutinizing their written negotiations, while this case concerns verbal communications. To now place such stout reliance on a case where the parties engaged in written negotiations seems flatly inconsistent with Mrs. McKenzie's prior argument. In fact, Mrs. McKenzie's reliance on this case buttresses the conclusion that the Court's ultimate responsibility, whether negotiations were conducted in oral or written form, is to evaluate the evidence in any particular case and determine when, if ever, the parties indicated an intent to be bound. Thus, <u>TecArt</u> offers further support for following <u>Estrin</u>, <u>ABT Associates</u>, and <u>Phoenix Life Ins</u>. Moreover, although <u>TecArt</u> found a contract to exist notwithstanding the open terms, there were far more settled terms included in the "Revised Binding Letter Agreement" than were agreed upon between Mrs. McKenzie and Comcast. Indeed, <u>no</u> settled terms exist in this case. Thus, there is no inconsistency inherent in finding that a contract existed in <u>TecArt</u>, but not in this case.

Because it is clear that the parties in this case did not manifest an intent to be bound, and, at most, were in the preliminary stages of negotiations, a contract was not formed and Comcast has not violated a contractual obligation. As such, it is unnecessary to consider whether the contract (which does not exist) is unenforceable because it violates the Statue of Frauds. Moreover, by Memorandum Opinion and Order on November 29, 2004, this Court denied Comcast's Motion to Amend its Answer to include this defense. Because no contract existed, Comcast is entitled to summary judgment on Mrs. McKenzie's breach of contract claim.

**<u>Promissory Estoppel</u>**

In Maryland, there had been some confusion prior to 1996 on the proper application of the theory of detrimental reliance, otherwise known as promissory estoppel.  In 1996, however, the Court of Appeals of Maryland held that Maryland courts are to apply the test from the Restatement (Second) of Contracts §90(1).  Pavel Enterprises, Inc. v. A.S. Johnson Comp., Inc., 674 A.2d 521, 532 (Md. 1996).  In order to succeed on her promissory estoppel claim, Mrs. McKenzie must therefore meet a four-element test.  She must show that there was "1. a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forbearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise." Id.

The first, and most obvious, obstacle facing Mrs. McKenzie is her ability to show that Comcast made a "clear and definite promise."  The Court has already concluded that few, if any, terms of the agreement were settled and that subsequent negotiations were necessary in order to form an enforceable contract.  This prior conclusion effectively shuts the door on this alternative theory of recovery.  See Dunnaville v. McCormick & Co., Inc., 21 F. Supp. 2d 527 (D. Md. 1998).  In Dunnaville, this Court determined that the promisor "never made a 'clear and definite' promise to [the promisee] . . . because so many important terms of the transaction were up in the air, including the purchase price and the extent to which [the promisor] was willing to finance the deal." Id. at 534.  The Court held that because "there was no deal as yet[,]" there was no clear and definite promise and it was not reasonable to conclude that the plaintiff relied on the defendant's vague statements.  Id. at 534-35.  Accordingly, the defendant was entitled to summary judgment on plaintiff's promissory estoppel claim.

Mrs. McKenzie contends that the statement "we will give your wife a show" is a clear and definite promise, in contrast to vague or uncertain statements such as: "we might give your wife a show" or "we think we can help your wife." P's Opp. at 18-19. Although the statement "clear and definite" is capable of many interpretations, the Court cannot concur with Mrs. McKenzie's. A clear and definite promise, as this Court interprets the Restatement, is one that reasonably defines the contours of the action or forbearance. This is reinforced by <u>Dunnaville</u>, which concluded that the statement "they had a deal" could not qualify as a clear and definite statement. <u>Dunnaville</u>, 21 F. Supp. 2d at 534-35. Mrs. McKenzie's argument could only be accepted if the indefinite statement in <u>Dunnaville</u> was "we might have a deal." Therefore, even if this Court were to conclude that Mrs. McKenzie's reliance on Comcast's vague statements was reasonable and that she did forbear to her detriment as a result of that reliance (of which there is much argument in the moving papers), her failure to meet the first element thwarts her ability to rely on the theory of promissory estoppel. As such, Comcast is entitled to summary judgment on Mrs. McKenzie's promissory estoppel claim.


**<u>Fraud/Negligent Misrepresentation</u>**

Mrs. McKenzie's complaint does not state a claim for negligent misrepresentation. The first discussion of this tort is in her Opposition. Thus, a claim arising under this tort is not properly before the Court.

Mrs. McKenzie also alleges that Comcast knowingly induced her to move to Maryland by intentionally misrepresenting its desire and ability to hire her company, Carol McKenzie Productions, to produce a TV show. These actions, Mrs. McKenzie alleges, give rise to a cause of action for fraud. Compl. ¶35. The elements of fraud in Maryland are as follows: "a plaintiff must

allege facts disclosing that (1) the defendant made a false representation to the plaintiff; (2) its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) the plaintiff suffered compensable injury resulting from the misrepresentation."  Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc., 665 A.2d 1038, 1047 (Md. 1995) (citations omitted); see also Maryland National Bank v. Resolution Trust Corp., 895 F. Supp. 762, 770 (D. Md. 1995); B.N. v. K.K., 538 A.2d 1175, 1182 (Md. 1988); Martens Chevrolet, Inc. v. Seney, 439 A.2d 534, 537 (Md. 1982).

In this case, Mrs. McKenzie alleges that Comcast's false representation was Gamble's statement that Comcast would "give her a show."  Comcast argues that this is the same alleged misrepresentation that Mrs. McKenzie relies on to form the basis of her contract claim, and "Mrs. McKenzie cannot use the doctrine of fraud to create a contract which does not otherwise exist."  D's Mot. at 24.  Comcast further contends that the "failure to fill a promise is merely a breach of contract, which must be enforced, if at all, by an action ex contractu."  Alleco, 665 A.2d at 1048 (citations omitted).  Comcast's assertion that Mrs. McKenzie is precluded from asserting simultaneous fraud and contract claims cannot withstand scrutiny.  Mrs. McKenzie, contrary to Comcast's contention, is not using the doctrine of fraud to create a contract out of whole cloth; rather, she is arguing that this doctrine affords her an alternative route of recovery, separate from her recovery under contract law.  Moreover, Comcast's position on this front is somewhat inconsistent with its position with regard to Mrs. McKenzie's contract claim.  It seems disingenuous for Comcast to argue that there is no contract because the "promise" is unenforceable, and then later argue that because Comcast made a "promise" the only theory under which Mrs. McKenzie can recover is

contract theory.   Mrs. McKenzie's fraud claim does, however, have some major obstacles to overcome.

A plaintiff's burden when opposing a motion for summary judgment on a fraud claim was recently discussed in Hale Trucks of Md. v. Volvo Trucks of North Amer., Inc., 224 F. Supp. 2d 1010 (D. Md. 2002).   In Hale Trucks, this Court explained that "[o]rdinarily fraud cannot be predicated on statements which are promissory in their nature, and therefore an action for deceit will not lie for the unfulfillment of promises or the failure of future events to materialize as predicted." Id. at 1032 (citations omitted).   Comcast predictably puts great weight on this statement and argues that its alleged agreement to give Mrs. McKenzie a television show is "promissory in nature" and therefore Hale Trucks's holding thwarts Mrs. McKenzie's claim.   Hale Trucks, however, proceeded to draw a very fine line when it further explained that, while broken promises are remedied by contract law, "a deliberate misrepresentation of one's existing intentions, where the misrepresentation is material, 'may form the basis for an action in fraud or deceit.'"   Id. (quoting Alleco, 665 A.2d at 1048).   This distinction is difficult to discern because many statements, including Comcast's statements regarding Mrs. McKenzie's television show, can appropriately be characterized as either statements of "existing intentions" or statements which are "promissory in nature."   The appropriate inquiry for a court, in its attempt to ascertain whether specific representations can give rise to a cause of action for fraud when they conceivably fall on either side of the line drawn in Hale Trucks, is a consideration of the defendant's intent.   In Hale Trucks this Court entered summary judgment in favor of the defendant because the plaintiff proffered no evidence to support its suspicion of the defendant's malicious intent, i.e. that the defendant never intended to follow through with his representation.   Id. at 1032.

14

In this case, Mrs. McKenzie submits, as proof of Comcast's intent, its transparently intense desire to hire her husband, see D's Ex. 3 (Mr. McKenzie Dep. at 17), and subsequent refusal to contact her upon Mr. McKenzie's termination.  While this alone may not suffice under Hale Trucks, the Court is persuaded that Comcast's own admission that "[t]o produce a show is something that we just don't do in [this] region or for the most part in the Atlantic division[,]" D's Ex. 4 (Gamble Dep. at 88), constitutes sufficient evidence, when viewed in the light most favorable to the non-moving party, that the representation of Comcast's then existing intent was false when made.  At a minimum, this admission of Comcast's policy not to produce shows convinces the Court that Gamble's statement "we will give your wife a show," considered in the context of the discussions with Mr. McKenzie, evinces a reckless indifference to the truth of the representation made.

The Court does recognize that "where, as in a fraud claim, the nonmoving party must produce clear and convincing evidence to support h[er] claim, that higher evidentiary burden is considered part of the 'summary judgment calculus.'" Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 447 (4th Cir. 2001) (Widener J., concurring in part and dissenting in part) (quoting Wells v. Liddy, 186 F.3d 505, 520 (4th Cir. 1999)); see also DeGirolamo v. Sanus Corp. Health Sys., 1991 WL 103383 at *4 (4th Cir. June 17, 1991) ("Even at the summary judgment stage fraud must be proved by clear and convincing evidence." (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55 (1986); Everett v. Baltimore Gas & Elec. Co., 513 A.2d 882, 889-90 (Md. 1996))).  And, although the Court does not hold that Mrs. McKenzie has submitted sufficient proof to determine that, as a matter of law, Comcast intended to defraud her, the Court does conclude that viewing this evidence in the light most favorable to the Plaintiff a reasonable jury could find by clear and convincing evidence that Comcast made a false representation and its falsity was either known or

that Comcast made the representation with reckless indifference as to its truth.  Thus, aided by the inferences in her favor under the summary judgment standard, Mrs. McKenzie is able to meet the first and second elements of fraud as set forth in <u>Alleco</u> and clarified in <u>Hale Trucks</u>, albeit not by a wide margin.

A major difficulty for Mrs. McKenzie's fraud claim, however, is the third element.  From the facts, it is most reasonable to conclude that, assuming Comcast never intended to give Mrs. McKenzie a show, this misrepresentation was made for the purpose of defrauding Mrs. McKenzie's husband (<u>i.e.</u> inducing him to accept the Comcast job under false pretenses), not Mrs. McKenzie herself.  Thus, the question presented by these facts is whether "a fraud plaintiff may hold a defendant liable for a misrepresentation made to a third party under Maryland law."  <u>Maryland Nat'l Bank v. Resolution Trust Corp.</u>, 895 F. Supp. 762, 772 (D. Md. 1995).  Harking back to the Nineteenth century case of <u>State v. Fox</u>, 29 A. 601 (1894), this Court explained that "Maryland law . . . has long allowed plaintiffs to sue for injuries caused by fraudulent misrepresentations made to third parties."  <u>Resolution Trust Corp.</u>, 895 F. Supp. at 772.  Although <u>Resolution Trust Corp</u>. considered a bank's claim against a trust for an alleged misrepresentation made by the trust's attorney to the circuit court, its rationale remains applicable to this case.  Neither the fact that Mrs. McKenzie is the spouse of the third party to whom the misrepresentations were made, nor the fact that some statements were made to Mrs. McKenzie herself as well as her husband, distinguishes this case from <u>Resolution Trust Corp.</u>'s sound holding.  <u>Resolution Trust Corp.</u> did, however, further limit the imposition of liability to cases where, in addition to making a misrepresentation, the defendant intended to induce the plaintiff to take action in reliance on its statement, or had reason to expect the plaintiff to do so.  <u>Id</u>. (citing Restatement (Second) of Torts §531).  This inquiry,

although it requires courts to consider different viewpoints, dovetails into the fourth prong of <u>Alleco</u>.

<u>Resolution Trust Corp.</u> reserves liability for only those cases where the party making the misrepresentation <u>intends</u> to induce reliance or has reason to believe the plaintiff will rely on its statement.  This requires a court to consider intent from the perspective of the defendant.  <u>Alleco</u> and other Maryland cases impose liability only where "the misrepresentation substantially induced the plaintiff to act[,]" <u>Nails v. S & R, Inc.</u>, 639 A.2d 660, 669 (Md. 1994), and plaintiff's reliance on the misrepresentation was reasonable.  This requires a court to consider <u>inducement</u> and reliance from the perspective of the plaintiff.  Although the Court cannot definitively state that Comcast had reason to expect Mrs. McKenzie to rely on its statements, a reasonable jury could arrive at that conclusion.  However, even if a jury did conclude that Comcast had reason to expect Mrs. McKenzie to take action in reliance on its statements, <u>Alleco</u> and <u>Nails</u> still require Mrs. McKenzie to prove that the misrepresentation was a substantial factor in her action or forbearance and that reliance on that misrepresentation was reasonable.

Comcast argues that Mrs. McKenzie cannot make the requisite showing that it was reasonable for her to rely on Comcast's statements.  To support its position, Comcast cites a recent Maryland case which held that

> [a] statement that is vague and indefinite in its nature and terms, or is merely a loose conjectural or exaggerated statement, is not sufficient to support either a fraud or negligent misrepresentation action, because such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain.

<u>Goldstein v. Miles</u>, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004) (citations omitted).  In <u>Goldstein</u>, the court held that the owner of a law firm's assertions that he would sell his firm to two associates

for less than market value "were not expressions of a firm intention to sell the firm to them; they were, rather, statements of probability or expectation." Id. The assertions made by the law firm owner could not be reasonably relied upon because they did not contain any material terms of the sale such as "purchase price, date of sale, interest rate, or terms of payment[.]" Id. Mirroring language from Maryland cases concerning contract law, Goldstein concluded that the statements made by the defendant "were too indefinite, vague, and general to be considered as anything more than expressions of expectation or probability and therefore are not actionable as fraudulent[.]" Id. at 332-33. Thus, Comcast's general contention is that the same inadequacy in Mrs. McKenzie's contract claim ultimately thwarts her fraud claim as well.

The current situation, however, is distinguishable from Goldstein because that case also relied on the experience of the parties. Id. at 333. The court explained that because both parties were attorneys, they knew that the representations made were too vague to be relied upon. Id. ("This situation was not one in which one party was a sophisticated business entity and the other an inexperienced consumer."); cf. Dunnaville, 21 F. Supp. 2d at 534-35 (holding, in the context of a promissory estoppel claim, that reasonable businessmen could not have relied on a statement that "they had a deal" when "so many terms of the transaction were up in the air."). In contrast, Mrs. McKenzie is not an attorney, and she was dealing with a sophisticated company. She does, however, represent herself to be a sophisticated businesswoman with broadcasting/production experience. The situation is, nevertheless, sufficiently distinguishable from Goldstein that the Court cannot conclude, as a matter of law, that Mrs. McKenzie's reliance on Gamble's statement was unreasonable. What does seem somewhat unreasonable, however, is Mrs. McKenzie's complacency for the period of time between when her husband told her that she would be given a show and her husband's

termination, the event that sounded the death-knell for negotiations between her and Comcast.  It is at least arguable that a person who believed in good faith that she would be given a show to produce would have been far more assertive during this period of time.

Mrs. McKenzie testified that Gamble made the statement in question to her husband in December 1999 or January 2000.  D's Ex. 1 (Mrs. McKenzie Dep. at 45).  Then, in approximately March 2000, Mrs. McKenzie moved up to Maryland.  Between March 2000 and November 27, 2001, the date Mr. McKenzie was informed of his termination, Mrs. McKenzie testified that there were sporadic comments made by various agents of Comcast regarding her television show.  For example, Mrs. McKenzie recounts one meeting with Mr. Jim Gordon ("Gordon"), an employee under Gamble, arranged by Mr. McKenzie for the purpose of discussing the particulars of Mrs. McKenzie's show. See id. at 97-105.  Apparently Gordon and Mrs. McKenzie met in his office, discussed show ideas and concepts, then proceeded to tour the studio facility at Tech Road.  Id. at 101-03.  Then, in March 2001, Mrs. McKenzie had a meeting with Burch, where he stated "so are you ready to do your show?"  Id. at 116.  Mrs. McKenzie highlights these encounters and brief conversations as a means of supporting her position that reliance was reasonable.  The Court finds it somewhat difficult to conclude, however, that a reasonable person would believe that Comcast was going to permit her to produce a show based on one statement made by a Comcast agent through her husband and these few sporadic meetings throughout a period of more than eighteen months.  The Court's skepticism, compounded with the higher evidentiary burden on a fraud plaintiff at the summary judgment stage, see Edell & Associates, 264 F.3d at 448, makes Mrs. McKenzie's ability to meet this element an extremely close call.  Ultimately, however, although Mrs. McKenzie must produce clear and convincing evidence that she meets each element, the Court simply cannot conclude that, based on

all of the circumstances presented, no reasonable jury could find her reliance reasonable.

Although Mrs. McKenzie can survive summary judgment, albeit by a narrow margin, on the first four elements of fraud, she must also prove that she suffered a legal detriment as a result of the misrepresentation.  Mrs. McKenzie alleges that she was injured by "expending time, money, and effort preparing for a show, forbearing a search for other employment, and ultimately suffering damage to her career by being out of television broadcasting while preparing for a show that was never meant to materialize."  P's Opp. at 23.  Comcast disputes this as a factual matter, contending that "Plaintiff did not give up any job or other employment in reliance on any statement by Comcast[.]"  D's Reply at 18.  After a comprehensive review of the record, the Court agrees with Comcast's position.

First, the Court notes that there is no indication in the record that Mrs. McKenzie, who was planning on joining her husband in Ft. Lauderdale, Florida prior to Comcast's intervention, had found employment in Florida.  In fact, Mrs. McKenzie admits that there was no promise regarding her employment made by the Florida employer.  D's Ex. 1 (Mrs. McKenzie Dep. at 50).  Moreover, she is unable to claim any damages for lost employment due to the move to Maryland, because her Louisville show would be terminated in any event upon her move from Kentucky to either Florida or Maryland.  Second, although Mrs. McKenzie states in her Opposition that she was injured by "forbearing a search for other employment, and ultimately suffering damage to her career by being out of television broadcasting[,]" the record is utterly devoid of any evidence of offers which she refused, overtures by other companies which she rebuffed, or any attempts to gain employment from which she abstained.  In fact, Mr. McKenzie, in his deposition, admitted that he and his wife met with SportsNet to discuss producing a different show.  See D's Reply Ex. 1 (Mr. McKenzie Dep. at

85).  Of course, Mr. McKenzie attempts to minimize the importance of the negotiations with SportsNet by explaining that his wife simply sought <u>additional</u> shows to supplement the income derived from her potential contract with Comcast.  <u>See id</u>. ("There is nothing wrong with doing more than one show.  It is not uncommon for anyone to do more than one show.").  Although it may be true that television producers often produce more than one show, the only evidence in the record pertaining to Mrs. McKenzie's job search during the time period between Gamble's statement and her husband's termination is that she was, in fact, searching for employment.  What speaks volumes about this issue is the absence of any evidence tending to prove Mrs. McKenzie's claimed damages, <u>i.e.</u> not searching for a job because she "already was promised one" by Comcast.  Therefore, the Court concludes that no reasonable jury could find, under a clear and convincing evidence standard, that Mrs. McKenzie "suffered compensable injury resulting from [Comcast's] misrepresentation." <u>Nails</u>, 639 A.2d at 668.

With all factual inferences resolved, as they must, in favor of Mrs. McKenzie, she has barely met the first four elements of <u>Alleco</u>, but simply cannot meet the final element.  Thus, Comcast is entitled to summary judgment on this claim.

**IIED**

In <u>Harris v. Jones</u>, 380 A.2d 611 (Md. 1977), the Court of Appeals of Maryland recognized the independent tort of intentional infliction of emotional distress, essentially adopting §46 of the Restatement (Second) of Torts.  <u>Harris</u> recognized four elements to this tort: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional

distress must be severe." Id. at 614.  As Harris noted, the second element has been a particularly

troublesome issue because the definitions of those terms are somewhat subjective and relative.  Id.

Harris itself, however, did not have to reach the question of whether the conduct in question was

extreme and outrageous.  Nevertheless, in discussing the contours of this element, it favorably cited

the Restatement's guidance.  See id. ("Section 46 of the Restatement, comment d, states that

'Liability has been found only where the conduct has been so outrageous in character, and so extreme

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community.'").  Thus, "Maryland courts have established a high

standard of culpability before conduct can be considered 'extreme and outrageous.'"  Farasat v.

Paulikas, 32 F. Supp. 2d 244, 247 (D. Md. 1997).  As a result, "[t]he tort of intentional infliction of

emotional distress is rarely viable."  Id. (citing Bagwell v. Peninsula Regional Med. Center, 665 A.2d

297 (Md. Ct. Spec. App. 1995)).

Mrs. McKenzie has not alleged any behavior of Comcast that comes even remotely close to

the outrageous level necessary to meet the second element of this tort.  Mrs. McKenzie argues that

Comcast was in a "position of power" in relation to her, thus making the behavior extreme and

outrageous.  Even if it were accepted that Comcast was "in a peculiar position to harass [Mrs.

McKenzie]," subjecting its conduct to "careful[] scrutiny," Harris, 380 A.2d at 615, the conduct

cannot be characterized as extreme and outrageous even under this heightened level of scrutiny.

Mrs. McKenzie also argues that because she had recently struggled with breast cancer, she

was more susceptible to emotional trauma.  Even armed with this knowledge, the claim that

Comcast's actions could be said to "strike to the very core of one's being, threatening to shatter the

frame upon which one's emotional fabric is hung[,]" Farasat, 32 F. Supp. 2d at 248 (quoting

22

Hamilton v. Ford Motor Credit Co., 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986)), falls far short of the mark.  Therefore, Comcast is entitled to summary judgment on Mrs. McKenzie's IIED claim.


**Race Claims**

Mrs. McKenzie, an African-American female, brings numerous claims asserting that Comcast engaged in unlawful racially motivated employment decisions.  First, Mrs. McKenzie alleges that Comcast retaliated against her because her spouse filed a complaint alleging racial discrimination while employed at Comcast.  Compl. ¶25-26.  Second, she alleges that race was a motivating factor in Comcast's decision not to hire her to produce a television show.  This second allegation forms the basis for two counts: Count Three asserting that race was a motivating factor in the decision not to produce Mrs. McKenzie's show, and Count Seven alleging that race was a motivating factor in Comcast's unilateral breach, and/or failure to perform its contract.  Because Mrs. McKenzie's contention that there was an enforceable contract is not viable as explained above, see supra at 5-10, Comcast is entitled to summary judgment on  Count Seven.

Mrs. McKenzie's retaliation claim is somewhat atypical.  She claims that her husband engaged in protected activity, and in retaliation Comcast subjected her to an adverse employment action: it did not hire her to produce and host a television show.  Comcast attacks this novel theory by making the obvious argument that the person alleging retaliation must be the individual who engaged in the protected activity.  Secondly, Comcast argues that Mrs. McKenzie is an independent contractor and therefore cannot avail herself of Title VII protections (for both retaliation and her failure to hire claim).

Comcast's first argument has been considered by numerous courts which have come to

23

diametrically opposed conclusions.  Some courts have explicitly stated that spouses or close relatives of employees who engage in protected activity can bring a retaliation claim against the employer who allegedly retaliated.  See EEOC v. Ohio Edison Co., 7 F.3d 541, 543-44 (6th Cir. 1993) ("We agree . . . that a plaintiff's allegation of reprisal for a relative's antidiscrimination activities states a claim upon which relief can be granted under Title VII."); Whittaker v. Northern Ill. Univ., 2003 WL 21403520 at *1 (N.D. Ill. 2003) ("The Seventh Circuit, however, has assumed, though it has not specifically held, that an employee is protected from retaliation under Title VII based on the protected activities of that employee's spouse."); Gonzalez v. N.Y. State Dept. of Correctional Services, 122 F. Supp. 2d 335, 346-47 (N.D.N.Y. 2000) ("[B]ecause plaintiff alleges to have suffered adverse employment action by defendants because of her husband's complaints of discrimination, she has standing to assert a Title VII claim.").

Other courts have explicitly rejected a spouse's retaliation claim in similar situations.  See Smith v. Riceland Foods, Inc., 151 F.3d 813, 819 (8th Cir. 1998) ("[T]he rule . . . that a plaintiff bringing a retaliation claim need not have personally engaged in statutorily protected activity if his or her spouse or significant other, who works for the same employer has done so[,] is neither supported by the plain language of Title VII nor necessary to protect third parties, such as spouses or significant others, from retaliation."); Holt v. JTM Indus., Inc., 89 F.3d 1224, 1226-27 (5th Cir. 1996) (concluding, in an ADEA case, that "the language that Congress has employed in [the ADEA] will better protect employees against retaliation than we could by trying to define the types of relationships that should render automatic standing under [the ADEA]."); EEOC and Mickle v. Bojangles Restaurants, Inc., 284 F. Supp. 2d 320, 325-30 (M.D.N.C. 2003) (holding that "the Court finds more persuasive the decisions of the circuit courts which reject reading a third-party retaliation

cause of action into Title VII" but ultimately finding that "the participation prong [of Title VII] is potentially broad enough to encompass retaliation against third parties in the circumstances alleged in the instant case.").

The Court does find persuasive <u>Gonzalez</u>'s reasoning that "[i]n the relatively rare situation where a husband and wife work together, prohibiting the retaliated against spouse from maintaining an action would provide a means for an employer to circumvent Title VII's remedial scheme.  Title VII should not be construed so narrowly." <u>Gonzalez</u>, 122 F. Supp. at 347.  Moreover, the Court does not agree with the concerns raised in <u>Mickle</u>, <u>see</u> <u>Mickle</u>, 284 F. Supp. 2d at 326 ("The number of lawsuits which could spawn from this rule could be enormous in a company of any size."), because this type of claim can only occur in the rare situations where a husband and wife are both employed by the same entity.  However, certain language in the Supreme Court's recent decision recognizing a cause of action for retaliation under Title IX, <u>Jackson v. Birmingham Bd. of Educ.</u>, 125 S. Ct. 1497 (2005), suggests that <u>Smith</u>, <u>Holt</u>, and <u>Mickle</u>'s conclusion is correct.[2]

Although interesting as an academic matter, ultimately this Court's interpretation of 42 U.S.C. §2000e-3 with respect to the ability of a spouse to bring a retaliation action is irrelevant

---

[2] In <u>Jackson</u>, the Supreme Court rejected the Board's argument that Jackson could not state a claim for retaliation under Title IX because he is an "indirect victim," <u>i.e.</u> the high school females at the Birmingham public schools were the actual victims. <u>Jackson</u>, 125 S. Ct. at 1507.  The Court explained that "[t]he statute is broadly worded; it does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint." <u>Id.</u>  The Court noted, however, that if the statute's wording tracked Title VII, then the Court would have accepted the Board's position.  <u>See id.</u> (recognizing that 42 U.S.C. §2000e-2(a)(1) provides that it is unlawful for an employer to discriminate <u>because of such individual's</u> race, color, etc.).  Retaliation under Title VII is made unlawful by 42 U.S.C. §2000e-3(a), which provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because <u>he has opposed</u> any practice made an unlawful employment practice by this subchapter, or because <u>he has made</u> a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a) (2005) (emphasis added).  Although Title VII's remedial purpose suggests that courts should give credence to the legislature's intent, rather than a blind adherence to the language, the Supreme Court's dictum in <u>Jackson</u> strongly indicates that a cause of action for retaliation under Title VII can only be brought by the person who was retaliated against.

because Mrs. McKenzie is not and never was an employee and is therefore unable to succeed on this claim. In Farlow v. Wachovia Bank of N.C., 259 F.3d 309 (4th Cir. 2001), the court clearly held that "Title VII only applies if [the plaintiff] was an employee of [the defendant.]" Id. at 313. Comcast argues that Mrs. McKenzie was not an employee by relying on her deposition testimony, see D's mot. at 27, and the relevant factors from the landmark case of Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989) setting forth the relevant inquiry for determining whether an individual is an employee or an independent contractor.[3]

Some of these factors point towards characterizing the potential relationship between Comcast and Mrs. McKenzie as an employer/employee relationship. Other factors suggest that, had she been hired, she would have most appropriately been characterized as an independent contractor. Looking broadly at the factors from Reid and attempting to visualize the hypothetical relationship between these parties that never came to fruition, the court concludes that Mrs. McKenzie, had she produced a show, would have been an independent contractor. This is a conclusion which even Mrs. McKenzie concedes. See D's Ex. 1 (Mrs. McKenzie Dep. at 71-71) (admitting that her understanding was that Comcast would hire Carol McKenzie Productions, not that Comcast was going to hire her as an employee).

Two significant facts, other than Mrs. McKenzie's admission, suggest that this is the

---

[3] Reid used agency law principles to determine whether a hired party was an employee or an independent contractor. Reid considered "the hiring party's right to control the manner and means by which the product is accomplished." Reid, 490 U.S. at 751. "Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative." Id. at 751-52 (citations omitted).

appropriate characterization of the potential relationship.  First, Mrs. McKenzie's husband admitted that she was searching for other TV show production opportunities because "it was not uncommon for anyone to do more than one show."  D's Reply at 20.  This suggests an independent contractor relationship.    Second, in television programming individuals are usually hired for their independent/innovative thinking.  Thus, Comcast would be reluctant to overtly control Mrs. McKenzie because that might stifle her creative abilities, the very reason she was hired.  Thus, the material facts of this case suggest that Mrs. McKenzie was an independent contractor, and would have been engaged as such.  Therefore, she cannot avail herself of the protections of Title VII, and Comcast is entitled to summary judgment on both her racial discrimination claims and her retaliation claim.

Moreover, even if Mrs. McKenzie were deemed to be an employee, her racial discrimination and retaliation claims nevertheless would not succeed because they cannot survive under the McDonnell Douglas burden-shifting test.  Where, as here, a plaintiff offers no direct evidence of discrimination, a court must apply the three-part proof scheme outlined in McDonnell Douglas, Corp. v. Green, 411 U.S. 792 (1973).  As outlined in McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination.  See id. at 802.  Once a plaintiff's initial burden is satisfied, the burden then shifts to the employer to present a legitimate nondiscriminatory reason for the adverse employment action alleged.  See Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 142 (2000).  If the employer meets its burden, the burden then returns to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination."  Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citation omitted).

In order "to establish a prima facie [Title VII] retaliation case, [Mrs. McKenzie] must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001) (citing Beall v. Abbott Laboratories, 130 F.3d 614, 619 (4th Cir. 1997)). Mrs. McKenzie can meet the first element because her husband's attorney informed Comcast that there was a possibility that a discrimination suit would be filed. P's Opp. at 28. The filing of an EEOC complaint is a protected activity. Assuming that an employment relationship was contemplated, the second element is also satisfied because Comcast's failure to hire Mrs. McKenzie as a host for a television show is an adverse employment action. The third element, however, is more difficult to meet and ultimately thwarts Mrs. McKenzie's retaliation claim.

Mrs. McKenzie submits no facts which would permit the Court to draw any inference that a causal connection existed between her husband's protected activity and Comcast's failure to give her a show. The sum total of Mrs. McKenzie's proffer regarding a causal connection is that

> Comcast's decision to end its relationship with Mrs. McKenzie was due to Mr. McKenzie's opposition to racism and Comcast's presumption of his wife's support of the same. Prior to Mr. McKenzie's termination, Mr. Gamble had arranged Mrs. McKenzie's meeting with Mr. Gordon, the Comcast Employee responsible for Comcast's television production in that area, and Mr. Burch had affirmed many times that he was still committed to getting Mrs. McKenzie's show up and running, as explained more fully in the Counterstatement of Facts. After Mr. McKenzie was fired in January of 2002, Mr. Burch has admitted that he refused to take the calls of the spouse "of an employee we terminated," virtually an admission of retaliatory intent and action (See P's Exhibit 36).

P's Opp. at 36. Mrs. McKenzie's interpretation aside, Burch's refusal to talk to the spouse of a

terminated employee can be more rationally explained in a far more benign manner: once Mr.

McKenzie stopped working for Comcast there was no obligation to speak to Mrs. McKenzie, and

it obviously would have been uncomfortable to talk with the spouse of an employee who was

recently terminated.  Considering these other viable possibilities, Mrs. McKenzie has failed to meet

the third element because the Fourth Circuit has clearly held that "self-serving opinion[s] . . . cannot,

absent objective corroboration, defeat summary judgment."  Williams v. Giant Food Inc., 370 F.3d

423, 433 (4th Cir. 2004).  Moreover, even if Mrs. McKenzie were able to make out a prima facie

retaliation claim, Comcast's legitimate nondiscriminatory reason for not giving her a show, namely

that Comcast did not produce a 30 minute talk show at all, would defeat her retaliation claim.

　　　Mrs. McKenzie's racial discrimination claim meets the same fate; it cannot survive under the

McDonnell Douglas burden-shifting test.  In this case, Mrs. McKenzie's assertions do not state a

claim for discrimination on the basis of race.  Mrs. McKenzie's complaint alleges that race was a

motivating factor in Comcast's decision not to produce Mrs. McKenzie's show.  Compl. ¶30.  This

appears to state a cause of action for a "failure to hire" racial discrimination claim.  In Mrs.

McKenzie's Opposition, however, she alleges that she already had an employment relationship with

Comcast, thus the claim now appears to have morphed into a racial discrimination "wrongful

discharge" claim.  P's Opp. at 30.  Although it is not of great importance because "Mrs. McKenzie

has offered: 1) no evidence that any similarly situated persons (of any race) were treated differently;

and 2) no evidence that she was denied [being] hire[d] or terminated in favor of any person of

another race[,]" D's Reply at 10, Mrs. McKenzie's claim must be considered a failure to hire claim

because there was no valid contract between the parties.

　　　In order to make out a prima facie failure to hire claim, Mrs. McKenzie must show "(i) that

29

[s]he belongs to a racial minority; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas, 411 U.S. at 802; see also EEOC v. Sears Roebuck & Co., 243 F.3d 846, 850 (4th Cir. 2001).

Comcast argues that Mrs. McKenzie cannot meet the second element because it does not produce a 30 minute talk show, the type of show Mrs. McKenzie claims to have been offered. Mrs. McKenzie rebuts by arguing that the Comcast had the ability to produce such a show. Even if the Court accepts Mrs. McKenzie's assertions regarding Comcast's ability to produce a show of the type she desired, and she is therefore deemed to have met the second required showing under McDonnell Douglas, the fact that Comcast did not currently have such a show constitutes a legitimate nondiscriminatory reason for not hiring her. It is reasonable to conclude that Comcast did not want to start a new type of show and that the intended use for their new television production studio was not to begin 30 minute talk shows. Therefore, if Comcast's lack of ability to offer a 30 minute talk show is not enough to defeat Mrs. McKenzie's prima facie showing, that fact does ultimately thwart Mrs. McKenzie's claim because it constitutes the legitimate nondiscriminatory reason for Comcast's decision not to hire her.

As Comcast has fulfilled its burden of stating a legitimate nondiscriminatory reason for its employment decision, Mrs. McKenzie has the burden of proving that race was the motivating factor and the reason given by Comcast was only a pretext. See McDonnell Douglas, 411 U.S. at 804-05 Her attempt to prove pretext fails because her primary contention is simply a restatement that Comcast "was clearly capable of providing production facilities . . . at its Tech Road location[.]"

P's Opp. at 32.  As previously stated, Comcast's decision not to enter into a new area of broadcasting is entirely reasonable and legitimate.  Mrs. McKenzie also attempts to prove pretext by stating that Comcast's "abrupt and inexplicable reversal of its established decision and promises to produce her show is recognizable as a blatant example of racial discrimination[.]"  Id. at 31.  This argument must also be rejected because Comcast's failure to hire Mrs. McKenzie was neither abrupt, see P's Opp. 5-11 (outlining the instances where Comcast mentioned the show to the Mrs. McKenzie and the letters sent by the Mrs. McKenzie over at least a one year period) nor was it inexplicable (again, Comcast was not, at that time, in the market for producing a 30 minute show).

For these reasons, even if Mrs. McKenzie were deemed to be an employee under Reid, Comcast would still be entitled to summary judgment on her retaliation and racial discrimination claims.

### CONCLUSION

For these reasons, Comcast's Motion for Summary Judgment will, by a separate order, be granted, and Mrs. McKenzie's Motion to Strike will, by a separate order, be denied as moot.


July 21, 2005                                            /s/
Date                                          ROGER W. TITUS
                                          UNITED STATES DISTRICT JUDGE